**FEDERAL INS. CO. v. HERRESHOFF MFG. CO.**

**No. 1698.**

District Court, D. Rhode Island.

Feb. 24, 1934.

Bigham, Englar, Jones & Houston and Charles A. Van Hagen, Jr., all of New York City, and Archibald C. Matteson, of Providence, R. I., for libelant.

William H. Edwards and Edward Winsor (of Edwards & Angell), both of Providence, R. I., for respondent.

LETTS, District Judge.

This is a libel in admiralty brought by the Federal Insurance Company, a New Jersey corporation, against the Herreshoff Manufacturing Company, of Bristol, R. I., to recover the sum of $4,400. The libelant was the insurer of the yacht Resolute, and sues, by right of subrogation, to recover the sum in question which was paid by it under its policy of insurance to one E. W. Clark, the owner of the yacht. The sum sought to be recovered represents $4,000 paid for a new mast to replace one destroyed and $400 for repairs to the boat. The mast was furnished, and repairs made, by the respondent, which is charged with negligently having caused the damage occasioning this expenditure.

The facts upon which the libel is brought may be briefly stated. In the spring of 1929 Mr. Clark made arrangements with the Herreshoff Manufacturing Company, widely known as designers, builders, riggers, and repairers of yachts and vessels, to change over the rigging of the yacht Resolute from a Marconi schooner to a Marconi sloop. This task involved the construction, stepping, and rigging of a single Marconi mast of a height of 137 feet above deck. For this purpose the defendant utilized the schooner's main mast, building it up to the required strength and length.

On April 24, 1929, the mast had been completed, including the attachment of all standing rigging, ready for stepping. The following morning at 7 o'clock the yacht was hauled around to the end of the wharf under

the shears and the mast stepped into place. The forestay and two shrouds on each side were made fast and set up by tackle blocks. The yacht was then returned to her slip alongside the wharf, where the riggers were to proceed with the work of making fast the shrouds, stays, and backstays. This was about the middle of the forenoon. It appears that considerable preparation had to be made before the riggers could proceed with their work. It was necessary to erect scaffolding, collect the turnbuckles, which were in a locker aboard the yacht, as well as assemble other parts of gear. As this work was in progress, it was found that the shackles which are closely fitted into the deck or chain plates did not permit the insertion of the pin or bolt necessary to effect their attachment, necessitating a delay while a workman from the shop effected the necessary corrections.

In the meantime, and in accordance with what appears to have been the practice at the Herreshoff yards, other workmen, assisted by members of the crew of the yacht, proceeded to fasten by blocks and tackles all the items of the standing rigging. These blocks and tackles were threaded with manila rope. It does not appear that any other type of block and tackle was available for use. No part of the rigging was permanently attached during the afternoon of the 25th. So far as the testimony indicates, however, had there been no delay incident to the failure of the shackles to properly fit the chain plates, only a few items of the rigging could have been permanently fastened that afternoon.

During the day, and after the yacht had been removed from the end of the wharf to its slip, which was on the south side of the wharf, the weather conditions, which had appeared promising in the morning when the work was started, changed. A strong wind came up from the southwest, developing toward night into a blow of considerable velocity. Capt. Berry, who was master of the Resolute and in the employ of its owner, had been in attendance while the work was in progress throughout the day, and assisted in attaching the various items of rigging by the blocks and tackles for the temporary support of the mast. About 5 p. m. he left the yacht, and returned on board some time between 7 and 8 in the evening. At this time he describes the wind as blowing strong and as "the strongest breeze coming into the dock that I have experienced there." He pulled in the slack on one tackle and made it fast and inspected the other lines of rigging. He described the yacht as "jumping about."

He further testified in substance that in his opinion everything possible to protect the mast for the night had been done, pending the permanent attachment of the turnbuckles and the anchoring of the rigging to the deck plates.

At another point in his testimony Capt. Berry further commented upon the conduct of the respondent as follows:

"Q. When the Herreshoff people left the boat at five o'clock you did not make any suggestion as to anything else that ought to be done? A. No, I did not.

"Q. You did not think that any other steps were necessary to be taken at five o'clock to make that mast safe, did you? A. No, sir.

"Q. You talked with the Herreshoff people when they quit the job at five? A. I did.

"Q. I suppose there was discussion as to whether everything was made fast and safe for the night? A. Yes, between Mr. Alder and myself.

"Q. You thought that everything prudent had been done, did you not? A. Yes."

Shortly after Capt. Berry had returned on board, and in the midst of what was described by several of the witnesses as a blow of unusual intensity for Bristol Harbor, the mast broke some ten or twelve feet above deck, falling across the end of the wharf and a yacht moored on the northerly side. The mast was a complete loss, and some damage . was done to the hatches, skylights, and rail of the Resolute.

The libelant settled the loss, under its policy of insurance with the owner, for $4,400. The settlement was the exact sum paid by the owner, Clark, to the respondent, by whom the repairs were made. The libelant now contends it should be repaid this sum by the Herreshoff Company on the ground that the loss was caused by its negligence. As grounds of negligence, the libel alleges (a) that the respondent did not proceed with the fastening of all the turnbuckles, regardless of the usual 5 o'clock quitting time; (b) that the respondent did not leave a sufficient force of men to take up on the tackle; (c) that the yacht should have been placed in the north slip, rather than in the south slip; (d) that the yacht should have been taken from the slip and moored to a buoy in the harbor; (e) that the respondent should have observed the weather indications and informed itself of the storm warnings and forecasts.

Most of these grounds are unsupported by any convincing testimony. Capt. Berry testified that just before the mast broke he

had inspected the tackles, making fast the rigging, and that all were in order with the exception of one, the slack in which he himself took up. If that be so, the absence of a larger force of men on board to take up the tackle was not a contributing factor to the breaking of the mast. The evidence also is convincing that as of the time the weather conditions had developed so that the yacht would have been more safely moored at a buoy in the harbor, or in the north slip, it would have been hazardous to have undertaken to move her. Nor is there substance in the claim of negligence for not observing the weather signals and forecasts. As already pointed out, the testimony is undisputed that at 7 o'clock in the morning, when the stepping of the mast was undertaken, the weather conditions were satisfactory. No warnings had been given until after the time the mast had been stepped and approximately the time that the yacht had been moved to its slip south of the wharf.

The only claim of negligence presented, in respect to which the testimony gives sufficient support to warrant a fuller consideration, is that incident to the failure of the respondent to proceed to accomplish the permanent fastening of the rigging with turnbuckles to the chain plates.

It is clear that there was a delay because the shackles did not fit the chain plates. It is undisputed also that the chain plates were made by the respondent in accordance with its own design. The negligence, however, alleged in the libel is not that the respondent was remiss in the construction or designing of these plates, but that it was negligent in not fastening all turnbuckles, "regardless of the usual knocking off time at five p. m." It appears from the testimony of Peterson, the head rigger, that, had there been no difficulty with the chain plates, there would have been time on the 25th to have spliced and permanently attached but three lines of the rigging. There appears no substantial dispute in the testimony that so doing would not have given any real added security to the mast, as this number of lines would have constituted only about one-sixth of the to-

tal. Nor can one be impressed with the argument that work should have continued after 5 p. m., when the testimony shows that from about 4 p. m. on the weather was too rough to have permitted any splicing from the scaffolding on which the riggers had to work.

In view of these circumstances, it is difficult to discern in what respect the conduct of the respondent's employees was negligent or unreasonable. As said by the court in the case of Baltimore & P. R. Railroad Co. v. Jones, 95 U. S. 439, 441, 24 L. Ed. 506: "Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done."

The fact of the loss of the mast and the resulting damage to the yacht is in no degree indicative of negligence, even though it be granted that the damage would not have occurred had the yacht been moored in some other place, or the mast removed earlier in the day and replaced in the yard when the wind first began to freshen, or if the work had not been started at all on April 25. Negligence is to be determined by considering the reasonableness of the foresight used, not by what could have been avoided by now employing aftervision.

The libelant has the burden of establishing that the conduct of respondent's employees, as each situation presented itself on the day in question, was unreasonable and not the conduct of a prudent person or what would ordinarily have been done. This the libelant has wholly failed to do.

I have examined the libelant's motion to amend its libel which was filed some days after the testimony was closed and both sides had rested. Nothing is presented by the amendments requested which would alter my decision if permission to amend were granted. This motion is denied.

The libel is dismissed, with taxable costs to the respondent.